**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| DANA ANDERSON,<br>         *Plaintiff,*<br><br>         v.<br><br>LORENZO LEWIS, in his personal capacity;<br>JEAN RHODEN, in her personal capacity;<br>MARYBETH BONSIGNORE, in her<br>personal capacity; TERRI-LYNN<br>JOHNSTON, in her personal capacity;<br>AIMEE PLOURDE, in her personal capacity;<br>ASTREAD FERRON-POOLE, in her<br>personal capacity; and RODERICK<br>BREMBY, in his personal capacity,<br>         *Defendants.* | No. 3:20-cv-370 (VAB) |

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

Dana Anderson ("Plaintiff") has sued Lorenzo Lewis, Jean Rhoden, Marybeth

Bonsignore, Terri-Lynn Johnston, Aimee Plourde, Astread Ferron-Poole, and Roderick Bremby

(collectively, "Defendants"). Ms. Anderson asserts claims under 42 U.S.C. § 1983 for failure to

act, failure to train, selective enforcement, supervisory liability, sex discrimination, hostile work

environment, retaliation, and conspiracy. *See* Fourth Am. Compl., ECF No. 78-1, at 32–52[1]

("Am. Compl."). She seeks, *inter alia*, front pay and benefits, compensatory damages,

expectancy damages, punitive damages, declaratory relief, and injunctive relief. *Id.* at 53.

Defendants have moved for summary judgment as to the operative pleading, Plaintiff's

Fourth Amended Complaint, in its entirety. *See* Mot. for Summ. J., ECF No. 156.

For the following reasons, Defendants' motion for summary judgment is **GRANTED** as

---

[1] When ECF-generated page numbers differ from internal page numbers, the ECF-generated page numbers are used.

to Counts One,[2] Two, Six, and Seven.

Summary judgment is also **GRANTED** as to any other claims brought against Defendants Bonsignore, Johnston, Plourde, Ferron-Poole, and Bremby.

Summary judgment is **DENIED** as to the hostile work environment theory of sex discrimination under Section 1983 against Defendants Lewis and Rhoden, a claim allegedly arising from Defendant Lewis's actions in March of 2018.[3]

# I.    FACTUAL AND PROCEDURAL BACKGROUND

## A.  Factual Background[4]

Ms. Anderson is a fifty-one-year-old, African American female. Am. Compl. ¶ 3. The State of Connecticut Department of Social Services ("DSS") hired her as a Quality Control Reviewer around 2006. *Id.* ¶¶ 3, 121. Ms. Anderson remained an employee until she was suspended in April 2018 and then terminated on May 25, 2018. *Id.* ¶¶ 5, 10.

Beginning around 2010, Ms. Anderson allegedly developed a serious medical condition that caused "long and intermittent absences from work for months at a time." *Id.* ¶ 9. Because of this, Defendants allegedly had information about her medical condition and knew, or should

---

[2] Count One raises both a failure to train claim and a failure to act claim. Am. Compl. at 32. The failure to train claim has since been withdrawn. Pl. Mem. at 60. The failure to act claim is also raised under Count Eight. Am. Compl. at 50. As such, the Court grants summary judgment as to Count One in its entirety and addresses the failure to act claim under Count Eight.

[3] Obviously, the scope of any evidence probative of this hostile work environment theory, *i.e.*, the admissibility of evidence before March of 2018, will be limited, as required by the applicable law. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) (holding that while recovery for discrete acts of discrimination or retaliation that occur outside of the statutory time period is precluded, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period."); *Kimball v. Village of Painted Post*, 737 Fed. App'x 564, 568 (2d Cir. 2018) (holding that under the "continuing violation doctrine," the proper inquiry for determining the timeliness of claims regarding acts that occurred outside the statutory time period is whether those acts are part of the same actionable hostile work environment practice as an act occurring after the cut off).

[4] The following facts are taken from the Complaint, the parties' Local Rule 56(a) statements, and related documents. The facts are presented in the light most favorable to Plaintiff as the non-moving party.

have known, that it could affect her ability to recall information and events. Mem. of L. in Opp. to Defs.' Mot. for Summ. J., ECF No. 176, at 31–33 ("Pl. Mem."). Despite her health challenges, Ms. Anderson allegedly received promotions "on three occasions during her tenure at DSS, and her work performance was classified as good/excellent . . ." Am. Compl. ¶ 8. Her record allegedly "evidenced no disciplinary events prior to March 22, 2018." *Id.* ¶ 124.

Lorenzo Lewis is a forty-one-year-old African American male, also employed by DSS. *Id.* ¶ 13. He worked in the same unit as Ms. Anderson beginning around 2014. *Id.* ¶ 14.

Jean Rhoden served as a Quality Control Supervisor and was "the immediate supervisor" of Ms. Anderson and Mr. Lewis. *Id.* ¶ 31.

Marybeth Bonsignore served as the Principal Human Resources Specialist at DSS. *Id.* ¶ 41. She conducted investigations into Ms. Anderson's and Mr. Lewis's complaints and signed the letter terminating Ms. Anderson in May 2018. *Id.* ¶¶ 41, 45.

Aimee Plourde served as the Assistant Director of Human Resources and supervised Ms. Bonsignore during her investigations. *Id.* ¶ 59.

Terri-Lynn Johnston served as the Equal Employment Opportunities Manager at DSS and conducted investigations into Ms. Anderson's and Mr. Lewis's complaints. *Id.* ¶¶ 75, 79.

Astread Ferron-Poole served as the Chief of Staff and the Affirmative Action Administrator at DSS, supervising Ms. Johnston during her investigations. *Id.* ¶¶ 109, 117.

Roderick Bremby served as the Commissioner of DSS, "the highest-ranking official at the State of Connecticut Department of Social Services." *Id.* ¶¶ 94, 98. He adopted and approved

the investigations conducted by Defendants Bonsignore and Johnston and he approved Ms. Anderson's termination. *Id.* ¶¶ 99–101.

Between 2014 and 2018, Mr. Lewis allegedly "subjected [Ms. Anderson] to numerous unwanted sexual comments about her breasts, buttocks, and clothes, over her constant objections[.]" *Id.* ¶ 132. Mr. Lewis also allegedly subjected Ms. Anderson to "unwanted touching" of her person, including "jamming the back of his office chair, and his knees into [Ms. Anderson's] hind quarters," "touching [] her buttocks with his hands," and "walking up behind her and snapping the strap of her brassiere[.]" *Id.* ¶¶ 129–130, 133. Ms. Anderson allegedly "lodged numerous complaints against [Mr. Lewis] to her superiors" who knew, or should have known, about his conduct. *Id.* ¶ 141. The Defendants allegedly provided "no meaningful remedy" to Ms. Anderson, and instead ordered Ms. Anderson and Mr. Lewis to attend a mediation. *Id.* ¶¶ 141–42. At some point thereafter, a DSS supervisor allegedly separated Mr. Lewis from Ms. Anderson "by staggering his work hours, and moving him from the unit, so there would be no contact between the two." *Id.* ¶ 171.

Around 2015, however, Ms. Anderson's work unit was allegedly transferred to DSS headquarters, located at 55 Farmington Avenue in Hartford. *Id.* ¶ 145. In the new office, Mr. Lewis was allegedly placed in a cubicle in the same row as Ms. Anderson's, "where both were separated only by the walls on their respective cubicles." *Id.* ¶ 147. Mr. Lewis allegedly "immediately began subjecting [Ms. Anderson] to new rounds of harassment," including "bumping his knees, hands, and sometimes his chair into [Ms. Anderson's] buttocks" and making "lewd comments" about Ms. Anderson's body. *Id.* ¶¶ 148–50.

On March 22, 2018, Ms. Anderson allegedly left her work area, which was on the tenth floor of the building, to use the restroom, which was located on the ground floor. *Id.* ¶¶ 185–86.

On her way back to her work area, Ms. Anderson allegedly boarded an elevator. *Id.* Mr. Lewis was allegedly waiting outside of the elevator bank as she disembarked. *Id.* ¶ 187. "[W]ithout provocation," Mr. Lewis allegedly "violently grabbed [Ms. Anderson] by the back of her neck[.]" *Id.* Ms. Anderson allegedly followed Mr. Lewis back onto the elevator "to administer a tongue lashing to him." *Id.* ¶ 200; Pl. Mem., Ex. 78, ECF No. 176-78 (Cameras 5 and 6, at 2:12:48–2:12:50p.m.). "When the door to the elevator closed, [Mr. Lewis allegedly] violently grabbed [Ms. Anderson] by her throat and began choking her." *Id.* ¶ 201. Ms. Anderson allegedly tried to punch and slap Mr. Lewis but she was allegedly unable to get him to release his hands from her throat. *Id.* ¶¶ 201–02. Ms. Anderson allegedly "grabbed [Mr. Lewis] in the groin area, and he finally released his hands from her throat." *Id.* ¶ 203. When the elevator doors opened, Ms. Anderson allegedly complained to the security guard that Mr. Lewis had "roughed her up in the elevator," but he allegedly "laughed at her." *Id.* ¶¶ 207–08.

When Ms. Anderson left the security guard's desk to return to her work area, she again allegedly entered the elevator with Mr. Lewis. *Id.* ¶¶ 210–11. On the elevator, Mr. Lewis allegedly "attacked [Ms. Anderson] again, but this time she was able to punch him, grab at his groin again, and push him away from her." *Id.* ¶ 211. When the elevator arrived on the tenth floor, Ms. Anderson allegedly exited, while Mr. Lewis allegedly continued to another floor. *Id.* ¶ 213.

On March 26, 2018, Ms. Anderson allegedly complained to her supervisor, Ms. Rhoden, who allegedly "informed [Ms. Anderson] that she could file a workplace violence report to DSS's Department of Human Resources." *Id.* ¶ 217. On March 28, 2018, Mr. Lewis allegedly filed a complaint against Ms. Anderson, stating that she "sexual[ly] harassed him by grabbing his penis and attacked him in an elevator." *Id.* ¶ 218. Around April 6, 2018, Ms. Anderson allegedly

filed a complaint with the Connecticut State Police and was allegedly questioned about the alleged assault. *Id.* ¶ 220. Weeks later, Mr. Lewis was allegedly arrested for assaulting Ms. Anderson and "his prosecution [allegedly] concluded with a deferred adjudication in the Hartford Judicial District Court." *Id.* ¶ 231.

On or around April 24, 2018, both Ms. Anderson and Mr. Lewis were allegedly "warned and then suspended[.]" *Id.* ¶ 221. On May 16, 2018, Ms. Bonsignore allegedly sent an Investigation Summary to Ms. Plourde, which stated that "although there was no video surveillance inside the elevator, [Ms. Anderson's] claim that she was choked by [Mr. Lewis] [did] not seem plausible . . . ." *Id.* ¶ 224. On May 25, 2018, Defendants allegedly terminated Ms. Anderson "on the claimed basis she had misrepresented accounts of [Mr. Lewis] assaulting her[.]" *Id.* ¶ 225. Mr. Lewis was allegedly retained because "his version of the incident was credible," *id.*, even though his report did not include the incident outside of the elevator on the tenth floor and allegedly contained false statements and omissions, as well. Pl. Mem. at 21–22.

Ms. Bonsignore investigated Ms. Anderson's and Mr. Lewis's allegations for the Human Resources Department. Am. Compl. ¶ 45. This report contained a recommendation to fire Ms. Anderson. *Id.* ¶¶ 48, 59. Ms. Bonsignore's report was sent to Ms. Plourde, who adopted the recommendation to terminate Ms. Anderson. *Id.* ¶ 59. Ms. Johnston conducted an investigation into Ms. Anderson's and Mr. Lewis's allegations for the Equal Employment and Opportunities Unit. *Id.* ¶ 79. Ms. Ferron-Poole supervised Ms. Johnston during the period when she was conducting her investigation. *Id.* ¶¶ 116–17. Mr. Bremby was the final official to sign off on Ms.

Johnston's investigations into Ms. Anderson's and Mr. Lewis's complaints and the final decisionmaker regarding Ms. Anderson's termination.  *Id.* ¶ 101.

Ms. Anderson also alleges that "[Mr. Lewis] is a predatory serial harasser, who has engaged in serial unwanted touching of a sexual nature of ten (10) female employees . . . from 2014 through March 2018." *Id.* ¶ 156.

Moreover, Ms. Anderson alleges that Defendants Bonsignore, Johnston, Plourde, Poole, and Bremby had previously terminated four other women, three of whom were African-American, "on the claimed basis they had 'produced reports containing falsities.'" *Id.* ¶ 180.

### B.  Procedural History

On March 18, 2020, Ms. Anderson filed her initial Complaint against Ms. Bonsignore, Ms. Rhoden, and Mr. Lewis in this Court. ECF No. 1.

On April 8, 2020, Ms. Anderson filed an Amended Complaint. ECF No. 11.

On May 14, 2020, Ms. Bonsignore, Ms. Rhoden, and Mr. Lewis filed a motion to dismiss the Amended Complaint. ECF No. 21.

On July 9, 2020, Ms. Anderson filed a memorandum in opposition to Defendants' motion to dismiss. ECF No. 34.

On August 4, 2020, Defendants filed a reply to Ms. Anderson's memorandum in opposition to the motion to dismiss. ECF No. 41.

On August 7, 2020, Ms. Anderson filed a response to Defendants' reply to her opposition to the motion to dismiss. ECF No. 42. Ms. Anderson also filed a notice of additional authority to supplement her response. ECF No. 43.

On November 13, 2020, this Court stayed the case until February 26, 2021. ECF No. 52.

On March 30, 2021, this Court granted the Defendants' motion to dismiss. ECF No. 57. The Court dismissed Ms. Anderson's state law claims for failure to allege exhaustion of administrative remedies. *Id.* at 13. The Court also dismissed her Section 1981 claims because she had failed to allege a contractual relationship with any Defendant. *Id.* at 14–15. While the Court dismissed Ms. Anderson's Section 1983 claims because her allegations related to discrimination were described in the Section 1981 context, it granted her leave to file a Second Amended Complaint with properly pled claims under Section 1983. *Id.* at 17.

On April 30, 2021, Ms. Anderson filed the Second Amended Complaint. ECF No. 61. This pleading added four new defendants: Amiee Plaurde, Terri-Lynn Hohnston, Rodrick Bremley, and Astread Ferron-Poole. Ms. Anderson misspelled Defendants' names in this version of her Complaint.

On June 29, 2021, Defendants filed a motion to dismiss the Second Amended Complaint. ECF No. 66.

On September 30, 2021, Ms. Anderson filed the Third Amended Complaint, which corrected the misspelled names of the four additional Defendants added in the Second Amended Complaint. ECF No. 77. This pleading correctly named Aimee Plourde, Terri-Lynne Johnston, Astread Ferron-Poole, and Roderick Bremby as Defendants.

On October 6, 2021, Ms. Anderson filed the Fourth Amended Complaint (also referred to by Defendants as the Amended Third Amended Complaint), which included seven pages

inadvertently omitted from the Third Amended Complaint. Am. Compl. This is the operative pleading in this case.

On November 22, 2021, Defendants filed a motion to dismiss the Fourth Amended Complaint. ECF No. 84.

On March 24, 2022, Ms. Anderson filed a memorandum in opposition to the motion to dismiss. ECF No. 116.

On May 3, 2022, this Court denied the motion to dismiss without prejudice to the same issues being raised in the context of a motion for summary judgment on a fuller record. ECF No. 135.

On June 6, 2022, Defendants filed another motion to dismiss for failure to comply with a court order regarding discovery. ECF No. 136.

On June 24, 2022, Ms. Anderson filed a response to the motion to dismiss. ECF No. 142.

On July 11, 2022, Defendants filed a reply. ECF No. 145.

On January 21, 2023, this Court ordered Defendants to file a motion for summary judgment and noting that the pending motion to dismiss would be addressed jointly with the motion for summary judgment. ECF No. 154 (later clarified in ECF No. 160 (Feb. 15, 2023)).

On February 10, 2023, Defendants filed a motion for summary judgment. Mot. for Summ. J., ECF No. 156; Memo of L. in Support of Mot. for Summ. J., ECF No. 156-1 ("Def. Mem."); Statement of Material Facts, ECF 156-2 ("Def. S.M.F.").

On June 16, 2023, Ms. Anderson filed a response to the motion for summary judgment. Pl. Mem.[5]

On July 12, 2023, this Court instructed Defendants not to further respond to Plaintiff's response unless instructed by the Court. ECF No. 178.

## II.      STANDARD OF REVIEW

Summary judgment is warranted if the record shows no genuine issue as to any material

fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving

party bears the initial burden of establishing the absence of a genuine dispute of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat a motion

for summary judgment by producing sufficient evidence to establish that there is a genuine

triable issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he

mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact." *Id.* at 247–48 (emphasis in original). "[T]he substantive law will identify

which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of

the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see*

*also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the

dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable

substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need

for a trial—whether, in other words, there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either

party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by

documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of

material fact," the non-moving party must do more than vaguely assert the existence of some

---

[5] The Court granted six extensions of time for Ms. Anderson to submit the Memorandum in Opposition. On June 8, 2023, the Court denied a seventh motion for extension of time and stated that "At this point, the Court will proceed with addressing the pending motion, and if the response is filed on June 8, 2023, the Court may consider it." Order, ECF No. 172. Ms. Anderson did not file her response until June 16, 2023. ECF No. 176.

unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). In other words, summary judgment is proper only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

### III.    DISCUSSION

Defendants seek summary judgment on all eight of Ms. Anderson's claims. Defendants argue that Ms. Anderson's claims are untimely; that Ms. Anderson failed to properly serve the Second and Third Amended Complaints; that Ms. Anderson has failed to demonstrate facts sufficient to suggest that she suffered any intentional constitutional violation; that Ms. Anderson's failure to train claim may not be brought against state actors; and that Ms. Anderson's claims are barred by qualified immunity.

The Court will first address the jurisdictional issues raised by Defendants before addressing any remaining claims.

### A.  The Statute of Limitations Issue

42 U.S.C. § 1983 does not have a statute of limitations, so federal courts "borrow the most analogous state statute of limitations." *Connelly v. Komm*, 3:20-CV-1060 (JCH), 2021 WL 5359738, at *3 (D. Conn. Nov. 16, 2021) (citing *Bd. of Regents v. Tomanio*, 446 U.S. 478, 488 (1980)). In Connecticut, it is well-established that courts borrow from Connecticut's personal injury statute to adopt a three-year statute of limitations for Section 1983 claims. *See Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994); *Esposito v. Aldarondo*, 3:22-CV-621 (MPS), 2023 WL 2228412, at *3 (D. Conn Feb. 24, 2023); *see also* Conn. Gen. Stat. § 52-577. When considering Section 1983 cases, courts also adopt state tolling rules, including both statutory and common law rules. *Pearl v. City of Long Beach*, 296 F.3d 76, 81 (2d Cir. 2002).

Defendants allege that Ms. Anderson's claims against Ms. Johnston, Ms. Plourde, Ms. Ferron-Poole, and Mr. Bremby are time-barred because they did not receive notice of this action within the three-year statute of limitations. Def. Mem. at 11. The argue that, although Ms. Anderson first filed the complaint against Defendants Johnston, Plourde, Ferron-Poole, and

12

Bremby on April 8, 2021, less than three years after her termination on May 25, 2018, she was required to properly serve Defendants within the statute of limitations in order to preserve her claims. *Id.* (citing *Hubert v. Dep't of Corrections*, 3:17-CV-248 (VAB), 2018 U.S. Dist. LEXIS 54244, at *21).

Ms. Anderson counters that her claims were timely, given the tolling of statutes of limitations in Connecticut between 2020 and 2021, due the COVID-19 pandemic. Pl. Mem. at 54.

The Court agrees.

On March 19, 2020, Governor Lamont issued an executive order, Executive Order 7G ("Order 7G"), as part of a series of orders meant to address the COVID-19 pandemic. Order 7G provided, in relevant part, that "time requirements, statutes of limitation or other limitations or deadlines relating to service of process, court proceedings or court filings" would be suspended "for the duration of [the] public health and civil preparedness emergency[.]" *Id.* ¶ 2. The suspension of statutes of limitations terminated on March 1, 2021 under Executive Order 10A. Executive Order 10A ¶ 5 (February 8, 2021).

Connecticut courts have considered the implications of Order 7G, namely whether it constituted a temporary suspension of enforcement of the civil statutes of limitations or a true tolling of such statutes of limitations. *See, e.g.*, *Taylor v. Pillai*, 3:21-CV-623 (SALM), 2022 WL 4080525, at *2 (D. Conn. Sept. 2, 2022). These courts have consistently concluded that "[b]oth federal law and Connecticut law recognize that 'toll' and 'suspend' are synonyms in the statutes of limitations context." *Esposito*, 2023 WL 2228412, at *4; *Artis v. D.C.*, 583 U.S. 71, 80–81 (2018) ("Our decisions employ the terms 'toll' and 'suspend' interchangeably."); *State v. Ali*, 660 A.2d 337, 342 n.8 (Conn. 1995). Therefore, "Order 7G tolled the applicable statute of

limitations on March 19, 2020, and [] the paused statutory periods 'resumed from the point where they had been paused' when Governor Lamont's suspension expired." *Esposito*, 2023 WL 2228412, at *4.

This is not the end of the inquiry. It is also well-established that federal courts should refrain from applying state tolling rules where "applying the state's tolling rules would defeat the goals of the federal statute at issue[.]" *Pearl*, 296 F.3d at 80. Section 1983 is intended to prevent "abuses of power by those acting under color of state law" and to compensate "persons injured by deprivation of federal rights." *Robertson v. Wegmann*, 436 U.S. 584, 591 (1978). The key question is whether the tolling of statutes of limitations under Order 7G would further these goals. Connecticut courts have universally held that such tolling does further Section 1983's policy interests by requiring defendants "to answer for the alleged rights violations" and granting plaintiffs their "day in court to seek compensation for [their] alleged constitutional deprivation." *Esposito*, 2023 WL 2228412, at *4; *Taylor*, 2022 WL 4080525, at *6; *Connelly*, 2021 WL 5359738, at *4.

Ms. Anderson's cause of action accrued on May 25, 2018, the day she was terminated. Am. Compl. ¶ 5. She filed the Fourth Amended Complaint, which named all Defendants, on October 9, 2021 and served them on December 2, 2021. Am. Compl.; Def. Mem. at 8. Given the

approximately year-long tolling under Order 7G, the Court finds Ms. Anderson's claims were timely.

Accordingly, Defendants' motion for summary judgment on statute of limitations grounds will be denied.

### B.  The Service of Process Issue

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Dynegy Midstream Servs. v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006), quoting *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). The Federal Rules of Civil Procedure establish that a plaintiff must serve all defendants within 90 days after a complaint is filed. *See* Fed. R. Civ. P. 4(m). If service is not effected within this period, the court "must dismiss the action . . . or order that service be made within a specified time." *Id.* If the plaintiff can demonstrate good cause for the failure to serve the defendant, however, "the court must extend the time for service for an appropriate period." *Id.* And, it is well-established that, "even in the absence of good cause," district courts have broad discretion to grant extensions under Rule 4(m). *Zapata v. City of N.Y.*, 502 F.3d 192, 196 (2d Cir. 2007).

In order to survive a motion to dismiss on the basis of lack of personal jurisdiction due to insufficient service of process, the plaintiff has the burden of proving that they adequately served the defendant(s). *Dickerson v. Napolitano*, 604 F.3d 732, 752 (2d Cir. 2010). However, a defendant may waive their right to contest improper service of process under Rule 4 by failing to raise such defense in a motion to dismiss, even if the defense was asserted in a timely answer. *Datskow v. Teledyne, Inc.*, 899 F.2d 1298, 1303 (2d Cir. 1990). Likewise, "even if insufficiency of process is raised in a motion or response, it can subsequently be waived by 'submission by

conduct' that leads the plaintiff to believe that service was adequate and no such defense will be continued." *Buon v. Spindler*, 65 F.4th 64, 74 (2d Cir. 2023), quoting *Trustees of Central Laborers' Welfare Fund v. Lowery*, 924 F.2d 731, 732–33 (7th Cir. 1991).

Equitable tolling is an extraordinary remedy appropriate only in "rare and exceptional circumstance[s]," *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (internal quotation marks omitted), in which a party is "prevented in some extraordinary way from exercising his rights," *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) (internal quotation marks and alterations omitted). It may be employed in cases "where the plaintiff actively pursued judicial remedies but filed a defective pleading during the specified time period," *Brown v. Parkchester S. Condos.*, 287 F.3d 58, 60 (2d Cir. 2002) (internal quotation marks omitted), typically because of the defendant's misconduct or the plaintiff's medical condition or impairment. *See Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003). A plaintiff generally must demonstrate both that they acted with reasonable diligence during the time period they seek to have tolled and that the circumstances are so extraordinary that the doctrine should apply. *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002).

Defendants argue[6] that Ms. Anderson's claims against Ms. Plourde, Ms. Ferron-Poole, Ms. Johnston, and Mr. Bremby are barred because she failed to properly serve them within 90 days of filing the first complaint naming them as Defendants. Def. Mem. 9–10. Defendants allege that Ms. Anderson never served the Second Amended Complaint, ECF No. 61, the first filing to name the four additional Defendants, nor the Third Amended Complaint, ECF No. 77. *Id.* They concede that Ms. Anderson served Ms. Plourde, Mr. Bremby, Ms. Ferron-Poole, and

---

[6] The Court notes that Defendants first raised this argument in their motion to dismiss, ECF No. 84 at 14-15. The Court dismissed the motion without prejudice to the same issues being raised in the context of a motion for summary judgment on a fuller record. Order, ECF No. 135.

Ms. Johnston with the Fourth Amended Complaint on December 2, 2021, before the deadline established by this Court. *Id.* at 8; ECF No. 86.

Defendants note, however, that "the filing of an amended complaint neither restarts nor tolls the time period to serve summons and a complaint under Rule 4(m)." *Levitant v. Workers Comp. Bd. of N.Y.*, No. 16 CIV. 6990 (ER), 2018 WL 1274734, at *4 (S.D.N.Y. Mar. 8, 2018). Therefore, because Ms. Anderson did not serve all Defendants with the First Amended Complaint that included them as individuals within 90 days of its filing (July 7, 2021), this Court "lacks jurisdiction over the individual Defendants in their personal capacities, and all claims brought against Defendants Plourde, Johnston, Bremby and Ferron-Poole in their personal capacities must be dismissed[.]" Def. Mem. at 8–9.

In response, Ms. Anderson argues that the operative pleading in this case is the Fourth Amended Complaint, filed on September 30, 2021. Pl. Mem. at 54–55. She notes that she had difficulty serving the four additional defendants and therefore requested additional time from the Court in order to locate and serve them. *Id.* at 55. Ms. Anderson argues that all Defendants were eventually served with the operative pleading before the December 30, 2021 deadline set by this Court, *see* ECF No. 86, thereby eliminating any service of process issues. Pl. Mem. at 54–55.

In the alternative, Ms. Anderson alleges: (1) that she properly served Defendants considering the suspension of deadlines relating to service of process under Order 7G, and (2) that the doctrine of equitable tolling is appropriate under these circumstances. Pl. Mem. at 56.

Ms. Anderson suggests that equitable tolling is appropriate in this case, given her significant challenges in locating and serving the Defendants. She also describes several personal challenges during the course of litigating this case (including twice contracting COVID-19, the

death of both of her parents, and "her destitution caused by the defendants"), which allegedly prevented her from properly serving the Defendants under Rule 4(m). Pl. Mem. at 56.

The Court agrees that, under the circumstances, Ms. Anderson has adequately served the Defendants.

Defendants are correct that the filing of an amended pleading does not necessarily toll or restart the time to serve summons and the complaint under Rule 4(m). In the case they cite, however, the court dismissed the complaint because it determined that the plaintiff "ha[d] not made any arguments—or put forward any evidence—that show good cause for his failure to properly serve Defendants." *Levitant*, 2018 WL 1274734, at *4. That is not the case here.

This Court granted Ms. Anderson leave to amend her Second Amended Complaint[7] and Third Amended Complaint. *See* ECF No. 70; ECF No. 79. Subsequently, after considering Ms. Anderson's various challenges related to service, the Court determined that there was good cause to extend the deadline for service of process. ECF No. 86 (exercising its broad discretion to grant extensions, *see Zapata*, 502 F.3d at 196). Any issues regarding insufficient service of process related to the superseded complaints are therefore rendered moot.[8] Ms. Anderson properly served

---

[7] The Court also notes that Defendants failed to raise insufficiency of process in their motion to dismiss as to the Second Amended Complaint, ECF No. 66. Therefore, Defendants have waived that defense and may not raise it now. *Datskow v. Teledyne, Inc.*, 899 F.2d 1298, 1303 (2d Cir. 1990).

[8] Moreover, once this Court granted Ms. Anderson leave to amend her Complaint and an extension of time to serve the Amended Complaint, service of a superseded version of the complaint became pointless. It is well-established that filing of an amended complaint supersedes the original and renders it "of no legal effect." *See, e.g.*, *International Controls Corp. v. Vesco*, 556 F.2d 665, 668–69 (2d Cir. 1977). A line of cases in this District and Circuit have held that service of a superseded complaint is not proper because the filing of an amended complaint renders the original complaint "a mere scrap of paper insofar as the case is concerned." *Phillips v. Murchison*, 194 F. Supp. 620, 622 (S.D.N.Y. 1961) (internal quotation marks omitted) (quoting *Leis v. Massachusetts Bonding & Ins. Co.*, 125 S.W.2d 906, 908 (Mo. App. 1939)).

all Defendants with the operative pleading, the Fourth Amended Complaint on December 2,

2021, well before the December 21, 2021 deadline set by this Court. ECF No. 97.

Accordingly, Defendants' motion for summary judgment on the grounds of insufficient

service of process will be denied.

### C.  The Section 1983 Claims

Section 1983 provides a private right of action against state and local government

officials for constitutional violations:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of
> any State or Territory . . . subjects, or causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but merely provides a

method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271

(1994) (internal quotation marks and citations omitted).

Ms. Anderson raises a general claim of sex discrimination in Count Four, while other

Counts lay out specific theories of sex discrimination (e.g. hostile work environment, retaliation)

or theories of liability (e.g. failure to act, supervisory liability).

In response, Defendants argue both that: (1) Ms. Anderson cannot demonstrate any

underlying intentional constitutional violation, and (2) that Ms. Anderson has failed to

demonstrate that a genuine issue of material fact exists with respect to any of the individual

counts. Def. Mem. at 14, 19.

The Court first addresses Count Four to resolve the question of whether Ms. Anderson

has established any inference of sex discrimination that would support liability under Section

1983. The Court then addresses the various more-specific theories of sex discrimination

advanced by Ms. Anderson. Finally, the Court addresses the various theories of liability raised by Ms. Anderson.

a.   Count Four: Sex Discrimination

Employment discrimination claims asserted under Section 1983 based on violations of equal protection are analyzed under the *McDonnell-Douglas* burden-shifting framework. *See Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause . . . ."); *Sorlucco v. N.Y.C. Police Dep't*, 888 F.2d 4, 7 (2d Cir. 1989) ("The Supreme Court has outlined a three-step analysis of factual issues in Title VII claims. By analogy, the same analysis applies to claims under section 1983." (citing *Tex. Dep't of Cmty. Aff. v. Burdine*, 450 U.S. 248, 252–56 (1981) and collecting cases)); *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

Under this framework, a plaintiff must first establish a *prima facie* case of intentional discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances that give rise to an inference of discrimination. *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). A plaintiff's burden for establishing a *prima facie* case is *de minimis*. *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) ("We have

characterized plaintiff's prima facie burden as 'minimal' and 'de minimis.'" (citing *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001))).

Defendants do not dispute that Ms. Anderson has established the first three prongs of the *McDonnell-Douglas* framework: she is a woman,[9] she was qualified for her position, and she was terminated on May 25, 2018. The parties dispute whether Ms. Anderson has met her burden to create a genuine issue of fact as to whether her termination occurred under circumstances giving rise to an inference of sex discrimination. Defendants therefore argue that because Ms. Anderson has failed to demonstrate that she was subject to any constitutional violation, all of her Section 1983 claims must fail. Def. Mem. at 14. Ms. Anderson additionally alleges, and Defendants dispute, that she was subjected to a hostile work environment, due to Defendant Lewis's continual sexual harassment and because of the other Defendants' failure to intervene. Pl. Mem. at 6.

Defendants claim that "[t]he undisputed facts in the record demonstrate that Ms. Anderson "had never lodged a workplace violence or sexual harassment complaint against Mr. Lewis" prior to March 26, 2018. Def. Mem. at 16. They further allege that "as soon as [Ms. Anderson] lodged a complaint against Mr. Lewis [after the elevator incident] . . . DSS responded immediately to protect her" and conducted a full and thorough investigation. Def. Mem. at 14–15. Defendants state that Ms. Anderson "unequivocally made multiple materially false statements to DSS both in her written complaints about Mr. Lewis and during her investigatory interviews." *Id.* Some of these statements, they allege, were "directly and indisputably refuted by video surveillance." *Id.* at 15. They state that Ms. Anderson was ultimately terminated for

_____

[9] Throughout Ms. Anderson's pleadings, she references the fact that she is an "African American female," *see, e.g.*, Am. Compl. at 1, but she does not directly allege any claims of racial discrimination. This Order, accordingly, focuses on her sex in analyzing her claims.

making false statements and violating DSS's sexual harassment policy. Def. S.M.F. ¶ 40. Mr.

Lewis was retained because his account was partially verified by Ms. Anderson's account and

because he demonstrated remorse. *Id.* ¶ 32; Def. Mem. at 6. Defendants therefore assert that Ms.

Anderson "cannot demonstrate that any of the Defendants subjected the Plaintiff to sex

discrimination" because she cannot plausibly allege that any adverse employment action was

taken because of her sex. Def. Mem. at 21. Finally, they claim that Ms. Anderson's inability to

recall facts and events reliably renders her claims futile. *Id.* at 6.

Ms. Anderson responds that Defendants failed to address her consistent complaints

regarding sexual harassment by Mr. Lewis between 2014–2018. Pl. Mem. at 6. She further

asserts that supervisors who knew about his ongoing harassment placed her in a cubicle next to

Mr. Lewis at the 55 Farmington Avenue office, thereby exposing her to further abuse. *Id.* at 13.

Ms. Anderson argues that the Defendants have mischaracterized the encounter outside the

elevators and that the lack of surveillance footage from within the elevator means that this

footage cannot resolve the discrepancies between Ms. Anderson's and Mr. Lewis's accounts of

the incidents. *Id.* at 28–29. Ms. Anderson further argues that any false statements in her

complaint and interview are attributable to her diagnosis of Pseudotumor Cerebri and her

associated memory loss, which she argues Defendants were aware of. *Id.* at 29–31.

Finally, Ms. Anderson argues that Mr. Lewis made similar "materially false statements"

in his written complaint regarding the incident on March 22, 2018; most importantly, she points

to the fact that his complaint failed to report that he touched Ms. Anderson's neck outside the

elevator on the tenth floor. *Id.* at 21. Ms. Anderson therefore argues that her dismissal—and Mr.

Lewis's retention—is evidence of disparate treatment and sex discrimination. *Id.* at 72–73. She

further suggests that her termination was at least partially an act of retaliation against her for

making complaints about Mr. Lewis. Am. Compl. at 47. Finally, Ms. Anderson also claims that this is not an isolated incident; she asserts that four other women, three of whom were African American, were also terminated for making similar false statements in written complaints to HR between 2016 and 2017. *Id.*

Ms. Anderson does not dispute that her memory is not entirely reliable, but she has provided some corroborating evidence for her key claims. First, the deposition testimony of two co-workers, Ms. Whichard and Ms. Cordier, provide at least some support for Ms. Anderson's claim that Mr. Lewis had a history of sexually harassing her. *See* Whichard Deposition Tr., ECF No. 177-8, at 7–10, 15–20 (Feb. 18, 2022); Cordier Deposition Tr., ECF No. 177-3, at 18–19, 23–24 (Mar. 28, 2022). Second, Ms. Whichard testified that Mr. Lewis had harassed her, as well. Whichard Deposition Tr. at 13–15. When Ms. Whichard filed a workplace violence complaint, the DSS investigator found her allegations to be unsubstantiated and did not pursue the matter further. *Id.* at 20; Def. S.M.F. ¶ 23. Third, Ms. Anderson has provided the affidavit of Ronald Roberts, Senior, the former Director of the SNAP Program and former supervisor of Ms. Rhoden. Mr. Roberts states that prior to his retirement in 2016, Ms. Rhoden was aware that Ms. Anderson had reported Mr. Lewis for sexual harassment and had brought the issue to his attention. Pl. Mem., Ex. 112, ECF No. 176-8, at 43 (Jan. 17, 2023) ("Roberts Aff."). Fourth, Ms. Koski has confirmed that Ms. Anderson described the events of March 22, 2018 to her contemporaneously in a way consistent with the allegations presented here. Koski Deposition Tr., ECF No. 177-4, 25, 53 (Feb. 28, 2022). Finally, Ms. Anderson has presented voluminous

medical records that discuss her medical conditions and associated memory issues. *See* Pl. Mem., Exs. 100–103, 113–115, 125, and 129.

The parties, therefore, dispute a number of facts that, under the totality of the circumstances, are material. Taken together and viewing the evidence in the light most favorable to Ms. Anderson, the Court finds that she has met her *prima facie* burden and introduced sufficient evidence to raise an inference of sex discrimination based on her personal experiences working at DSS, including the alleged consistent sexual harassment by Mr. Lewis, Defendants' failure to separate her from Mr. Lewis after her complaints, and the events of March 22, 2018. Defendants' motion as to any claims related to Ms. Anderson's individual experiences of sex discrimination at DSS will be denied.

The Court holds, however, that Ms. Anderson has failed to allege facts sufficient to support an inference of a broader pattern of discrimination based on sex at DSS. While she asserts that DSS terminated four other female employees for filing false reports around the time of Ms. Anderson's termination, this information alone means little. Ms. Anderson has not produced evidence about the number of male employees terminated for false reports during the same time period, nor evidence of any male employees who engaged in the same conduct but

were treated differently. Without any frame of reference or comparator, it is not possible to assess Ms. Anderson's claims of pervasive discrimination against women.

Accordingly, Defendants' motion as to any claims dependent on a showing of systemic discrimination at DSS will be granted.

The Court now turns to Ms. Anderson's various theories of sex discrimination.

### b. Theories of Sex Discrimination

Ms. Anderson alleges several distinct theories of sex discrimination under various counts. She argues that Defendants selectively enforced DSS policy, disproportionately terminating female employees for infractions that male employees were merely suspended for; that Defendants created and maintained a hostile work environment; that Defendants retaliated against her for complaining about Mr. Lewis's harassment; and that Defendants Lewis and Rhoden conspired to terminate her employment in order to conceal Defendant Lewis's harassing conduct and Ms. Rhoden's failure to intervene. The Court addresses each of these arguments in turn.

### iii. Selective Enforcement (Count Two) [10]

Claims of employment discrimination based on selective enforcement are first analyzed under the *McDonnell-Douglas* framework. A plaintiff must first establish a *prima facie* case of

---

[10] There are two distinct pathways for proving an Equal Protection violation based on selective enforcement. *See Hu v. City of N.Y.*, 927 F.3d 81, 93 (2d Cir. 2019). First, under a class-based theory, plaintiffs must plausibly allege that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *King v. City of N.Y.*, 581 F. Supp. 3d 559, 576 (S.D.N.Y. 2022) (quoting *Crowley v. Courville*, 76 F.3d 47, 52–53 (2d Cir. 1996)) (hereinafter, a "*LeClair* claim"). Second, "[t]he Supreme Court has also recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges (1) that she has been intentionally treated differently from others similarly situated and (2) that there is no rational basis for the difference in treatment." *Servidio Landscaping, LLC v. City of Stamford*, No. 3:19-CV-01473 (KAD), 2020 WL 7246441, at *3 (D. Conn. Dec. 9, 2020) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (quotation marks omitted)) (hereinafter, an "*Olech* claim").
In granting Ms. Anderson leave to amend her complaint, this Court noted that she lacked a viable Section 1983 claim under a class-of-one theory. *See* Ruling and Order on Mot. to Dismiss, ECF No. 56, at 18 n.6 (Mar. 30, 2021).

intentional discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) "the adverse action occurred under circumstances that give rise to an inference of discrimination." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015).

To fulfill the fourth requirement and make a showing of disparate treatment as part of a *prima facie* case, a plaintiff must establish both the existence of valid comparators and differential treatment from such comparators. *See Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004) (describing that a showing of similarly situated comparators is a "threshold" requirement and that a showing of differential treatment is "a prerequisite to selective enforcement"). As to the first showing, a plaintiff generally must demonstrate that they are "similarly situated in all material respects" to the individuals with whom they seek to compare themselves. *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). Once the existence of an appropriate comparator is established, a court must evaluate "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (internal quotation marks omitted). While the comparator's situation need not be functionally identical to that of the plaintiff, "[t]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010). Although the question of whether

---

The Court therefore limited Ms. Anderson's leave to file an amended pleading, stating that a future Section 1983 claim would be considered, "provided that it is not . . . premised on a class-of-one theory." *Id.* at 19. The Court therefore analyzes Ms. Anderson's selective enforcement claim only as a *LeClair* claim, notwithstanding the arguments in her opposition to Defendants' motion for summary judgment, which depend on a class-of-one theory. *See* Pl. Mem. at 57.

comparators are similarly situated is typically a question of fact for the jury, a court may

"properly grant summary judgment where it is clear that no reasonable jury could find the

similarly situated prong met." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d

Cir. 2001).

As described above, a plaintiff's burden is not satisfied once they have demonstrated the

existence of an appropriate comparator. Where an employer has proffered a non-discriminatory

reason for different treatment of the plaintiff and the comparator, the plaintiff must then prove by

a preponderance of the evidence that the legitimate reasons offered by the defendant were not the

real reason for the adverse employment decision. *Mandell*, 316 F.3d at 380–81 (once an

employer produces evidence of a legitimate reason for its actions, a plaintiff must prove that the

real reason for the adverse employment decision was discrimination). One recognized method

for raising this inference is to show that "an employer treated plaintiff less favorably than a

similarly situated employee outside of his protected group[.]" *Ruiz*, 609 F.3d at 493 (internal

quotation marks omitted).

Ms. Anderson has asserted a claim of selective enforcement as to Defendants Rhoden,

Bonsignore, Johnston, Ferron-Poole, Plourde, and Bremby. She cites not only her termination,

but also the investigations into her and Mr. Lewis's complaints, as evidence of selective

enforcement. She argues that "she was accused of the same conduct as [Mr. Lewis], but

defendants retained Lewis . . . ." while she was terminated. Pl. Mem. at 59. Ms. Anderson further

argues that she produced a letter from her doctor informing Defendants of her memory issues,

which, she contends, proves that she did not intentionally lie and explains any factual

discrepancies in her complaint. *Id.* at 59, Ex. 113, at 4–7. Finally, Ms. Anderson alleges that four

other female employees of DSS were accused of filing false reports, investigated, and eventually

terminated. *Id.* at 58, Ex. 13, at 6–7, 12–13. Based on this showing, Ms. Anderson argues that there is sufficient evidence in the record to suggest that Ms. Johnston, Ms. Bonsignore, Ms. Ferron-Poole, and Mr. Bremby engaged in a pattern of conduct that selectively enforced DSS policy and disproportionately targeted and terminated female employees. *Id.* at 57.

Defendants argue that Ms. Anderson and Mr. Lewis were not similarly situated because Mr. Lewis's central allegation (that Ms. Anderson grabbed his groin) was substantiated by Ms. Anderson, whereas Ms. Anderson's allegations (that Mr. Lewis attacked her inside of the elevator twice) were unsubstantiated. Def. Mem. at 6. Defendants also assert that Mr. Lewis's account was corroborated by security footage and that he was remorseful.[11] *Id.*; Bonsignore Deposition Tr., ECF. No. 177-9, at 79–80. Defendants state that Mr. Lewis's misconduct, "which was the basis for his suspension in lieu of termination, was that Mr. Lewis had touched [Ms. Anderson's] neck on March 22, 2018 outside of the elevator on the 10th floor." Def. Mem. at 8. Ms. Anderson was terminated, on the other hand, because she "provided to DSS Human Resources a Workplace Violation Complaint (SEC-1) which contained false statements" and because she "violated the agency's sexual harassment policy by grabbing a co-worker's penis." *Id.* Based on these facts, Defendants argue that they are entitled to summary judgment, as Ms. Anderson has failed to produce any facts to suggest that she and Mr. Lewis were similarly situated or that their differential treatment was based on their sex.

The Court agrees.

On this record, a reasonable jury could conclude that Ms. Anderson and Mr. Lewis held similar positions and engaged in similar conduct—both worked under Ms. Rhoden in the same department at DSS and both submitted complaints containing at least some false information. It

---

[11] Ms. Anderson disputes these assertions.

is also clear that there is no obvious, impartial way to assess the validity of their respective accounts. Security footage is available only for the incident which neither reported—when Mr. Lewis touched Ms. Anderson's neck outside of the elevator on the tenth floor—and there is no footage to address the events that occurred within the elevator. And while Ms. Anderson's account corroborates part of Mr. Lewis's allegations (that Ms. Anderson grabbed Mr. Lewis's groin), her account of events is markedly different from Mr. Lewis's and includes allegations of longstanding issues of sexual harassment. Moreover, Defendants claim that Mr. Lewis's retention was justified because he was "remorseful" but they have not explained to what extent Ms. Anderson's explanation for her untrue statements (her medical condition) was considered when making the decision to fire her. In short, there are genuine issues of material fact regarding whether Ms. Anderson and Mr. Lewis were similarly situated and whether DSS was reasonable in treating them differently after the March 22, 2018 incidents.

But Ms. Anderson cannot prevail on a selective enforcement theory because she has failed to provide any evidence to suggest that this arguably differential treatment was based on her sex. As discussed above, there is insufficient record evidence to support any claims of systemic discrimination against female employees at DSS. Ms. Anderson has not provided any evidence that could establish potential comparators, such as the number of male employees or non-African American employees who were terminated for filing false information during that time period or any information about male or non-African American employees who engaged in similar conduct but were not terminated during the relevant period. *See, e.g.*, *62-64 Kenyon Street, Hartford LLC v. City of Hartford*, 3:16-cv-617 (VAB), 2018 WL 2926560, at *3 (D. Conn. June 8, 2018) (finding that summary judgment was appropriate where the record contained no evidence about potential comparators besides the plaintiff's conclusory statements).

As a result, it is impossible to determine whether female employees were treated differently than male employees, let alone whether this difference was attributable to discriminatory intent. *Zahra v. Town of Southold*, 48 F.3d 674, 684 (2d Cir. 1995) (affirming dismissal where the plaintiff had demonstrated differential treatment but had failed to prove that the selective enforcement was motivated by an intention to discriminate on the basis of impermissible considerations). Therefore, Ms. Anderson's allegations are not sufficient to raise a genuine issue of triable fact regarding whether Defendants selectively enforced DSS policies in such a way as to disproportionately affect female employees in general. *See Hu v. City of N.Y.*, 927 F.3d 83, 101 (holding that to prevail under a theory of selective enforcement a plaintiff must allege specific examples of differential treatment of similarly situated comparators) (citing *Albert v. Carovano*, 851 F.2d 561, 573 (2d Cir. 1988) ("To support a claim of selective enforcement, appellants must allege purposeful and systematic discrimination by specifying instances in which they were singled out for unlawful oppression in contrast to others similarly situated." (internal quotation marks and alterations omitted))).

Apart from her systemic allegations, Ms. Anderson has not produced any record evidence to suggest that Defendants' proffered reasons for treating her differently from Mr. Lewis were false, nor that her termination was in any part motivated by her sex. In her own deposition, Ms. Anderson admitted that she had no evidence that Mr. Lewis's sex played any role in the decision to suspend him for 25 days rather than terminate his employment. Pl. Deposition Tr., ECF No. 177-7, at 130. She further admitted that she was unaware of any evidence that Ms. Rhoden, Ms. Bonsignore, Ms. Plourde, Ms. Johnston, Ms. Ferron-Poole, or Mr. Brembly had discriminated against her on the basis of her gender. *Id.* at 148-50.

Accordingly, Defendants' motion for summary judgment on Ms. Anderson's claim of

selective enforcement, Count Two, will be granted.

### iv.   Hostile Work Environment (Count Five)

To make out a hostile work environment claim, the plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). This requires showing both that the conduct at issue is "severe or pervasive enough that a reasonable person would find it hostile or abusive" and that the victim "subjectively perceive[d] the work environment to be abusive." *Id.* at 321.

Defendants do not directly address this standard or its applicability to the record evidence, but do not seem to dispute that Ms. Anderson subjectively found her work environment to be abusive. They do contest the objective component of the test, arguing that Ms. Anderson "cannot demonstrate that she was ever subjected to a hostile work environment," given the surveillance video and lack of corroboration of her account by witnesses. Def. Mem. at 21.

The Court disagrees.

As described above, the video surveillance footage depicts only one of the alleged incidents on March 22, 2018. It does not show the events that allegedly occurred inside of the elevator, nor does it bear on Mr. Lewis's alleged continual harassment of Ms. Anderson over a period of four years.

Ms. Anderson has produced testimony from three DSS employees confirming various parts of her account. *See* Whichard Deposition Tr. at 7–10, 15–20; Cordier Deposition Tr. at 18–19, 23–24; Roberts Aff. Ms. Yolanda Whichard testified that she had witnessed Mr. Lewis rolling his chair and bumping his chair or knee into Ms. Anderson's butt. Whichard Deposition

Tr. at 8. She described Ms. Anderson as "startled" during these incidents. *Id.* She also witnessed Mr. Lewis "talk[] about grabbing body parts" of Ms. Anderson's and "heard some things . . . like that that [she] didn't want to hear." *Id.* at 17. Ms. Whichard explained that Mr. Lewis had made many more comments of this sort to Ms. Anderson that she did not witness because "he would walk out of the aisle to the front of her cubicle and kind of like stand over the top, and he would very quietly say stuff to her so that [she] couldn't hear what he was saying to her many times." *Id.* Finally, she recalled Mr. Lewis snapping Ms. Anderson's bra strap once or twice. *Id.* at 18.

Ms. Cordier testified that she witnessed Mr. Lewis touching Ms. Anderson's shoulders without her consent on numerous occasions, both when she was sitting at her desk and standing in the hall. Cordier Deposition Tr. at 18–19. Mr. Lewis also consistently rolled his chair into Ms. Anderson's cubicle and bumped into her with his knee, elbow, and the chair. *Id.* at 25. She confirmed that Ms. Anderson "would always complain about how [Mr. Lewis] was always . . . touching her[.]" *Id.* at 19. She also explained that "we all told him to leave her alone." *Id.* Finally, Ms. Cordier testified that she was aware of Ms. Anderson complaining about Mr. Lewis's conduct to Ms. Rhoden "[m]ore than once" prior to March 22, 2018. *Id.* at 21–22 (stating that Ms. Anderson had complained to Ms. Rhoden multiple times), 27 (confirming that the complaints pre-dated the elevator incident).

Finally, in his affidavit, Mr. Roberts stated that he served as Director of the SNAP Program at DSS until his retirement in June 2016. Roberts Aff. ¶¶ 4–5. Around the Summer of 2014, he became aware of an incident concerning sexual harassment between Ms. Anderson and Mr. Lewis. *Id.* ¶ 8. Ms. Anderson had made a complaint against Mr. Lewis, Mr. Lewis had denied the allegations, and Mr. Lewis had filed a counterclaim that Ms. Anderson had sexually harassed him, resulting in a "he said, she said" situation. *Id.* ¶ 10. Mr. Roberts wrote that "[t]he

matter . . . was originally brought to [his] attention by the supervisor, Ms. Jean Rhoden," but that he counselled Ms. Anderson and Mr. Lewis outside of Ms. Rhoden's presence. *Id.* ¶ 12. Mr. Roberts "made the personal observation that Ms. Anderson was potentially more credible" and that Mr. Lewis was "quite shady." *Id.* ¶ 11. Ultimately, Mr. Roberts warned Mr. Lewis to leave Ms. Anderson alone, and as a remedy, the two were separated by staggering their shifts and moving Mr. Lewis to the basement of the building." *Id.* ¶¶ 13, 16.

Taken together, this evidence is sufficient to create a genuine issue of material fact as to whether Ms. Anderson's unit at DSS was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21.

Accordingly, Defendants' motion for summary judgment as to the hostile work environment claim, Count Five, will be denied.

### v.  Retaliation (Count Six)

Retaliation claims are analyzed under a variation on the *McDonnell Douglas* framework. To make out a prima facie case for a retaliation claim, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 316 (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). Once the plaintiff meets this burden, the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Hicks*, 593 F.3d at 164. The plaintiff must then show that "retaliation was a substantial reason for the adverse employment action,"

and can do so by showing that "a retaliatory motive played a role in the adverse employment action even if it was not the sole cause." *Id.* (internal quotation marks omitted).

An adverse employment action is any "materially adverse change" in the terms and conditions of employment. *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000), quoting *Richardson v. N.Y.S. Dep't of Correctional Servs.*, 180 F.3d 426, 446 (2d Cir.1999). Such a materially adverse change "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Galabya*, 202 F.3d at 640, quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993); *see also Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997) (holding that Title VII, and therefore Section 1983,[12] protects employees against "less flagrant reprisals" than termination or a reduction in wages and benefits).

"A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015). When relying merely on temporal proximity, courts "uniformly hold that the temporal proximity must be very close." *Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001). The Second Circuit has declined to draw "a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Lewis v. Roosevelt Island Operating Corp.*, 246 F.Supp.3d

---

[12] *See Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause); *Sorlucco v. N.Y.C. Police Dep't*, 888 F.2d 4, 7 (2d Cir. 1989) (the analysis of factual issues in Title VII cases is, by analogy, the same applicable to claims under section 1983) (citing *Tex. Dep't of Cmty. Aff. v. Burdine*, 450 U.S. 248, 252–56 (1981) and collecting cases))

979, 991 (S.D.N.Y. 2017) (quoting *Littlejohn*, 795 F.3d at 319). Caselaw from within the Circuit,

however, "often finds a limit at two or three months and almost universally disapproves longer

time periods[.]" *See Raymond v. City of N.Y.*, 317 F. Supp. 3d 746, 774–75 (2d Cir. 2018);

*Adams v. Ellis*, No. 09 Civ. 1329 (PKC), 2012 WL 693568, at *16 (2d Cir. Mar. 2, 2012).[13]

Notably, plaintiffs "may not rely on conclusory assertions of retaliatory motive to satisfy the

causal link." *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004).

 Ms. Anderson brings a retaliation claim against Defendants Rhoden, Bonsignore,

Johnston, Poole, Plourde, and Bremby. She argues that the Defendants acted in various ways "to

dissuade a reasonable worker, such as [Ms. Anderson] from making or supporting a charge of

discrimination." Am. Compl. ¶ 365. Ms. Anderson first argues that Ms. Rhoden created a culture

that discouraged employees from filing complaints. Pl. Mem. at 74. Ms. Anderson also argues

that she was terminated in retaliation filing a formal complaint about Mr. Lewis, and that the

causal connection between the two events may be inferred, at least in part, by their temporal

proximity. *Id.* at 72–73. Moreover, although she does not name Defendant Lewis in this claim,

she argues that Mr. Lewis took an adverse employment action against her by filing a false

counter-complaint on March 28, 2018, which ultimately resulted in her termination. *Id.*; Am.

---

[13] Compare *Richardson v. N.Y.S. Dep't of Corr. Servs.*, 180 F.3d 426, 446–47 (2d Cir. 1999) (one month sufficient), *Quinn v. Green Credit Tree Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (ten days and two months, respectively, sufficient), and *Henderson v. Ctr. For Cmty. Alternatives,* 911 F. Supp. 689, 702 (S.D.N.Y.1996) (six weeks sufficient), with *Hollander v. Amer. Cyanamid Co.*, 895 F.2d 80, 85–86 (three months too long), *Burkvbile v. Bd. of Educ.*, 411 F.3d 306, 314 (2d Cir.2005) ("more than a year" too long), *Wright v. N.Y.C. Off–Track Betting Corp.*, No. 05 Civ. 9790, 2008 WL 762196, at *5 (S.D.N.Y. March 24, 2008) (five months too long in light of two-month "dividing line"), *Murray v. Visiting Nurse Servs.*, 528 F.Supp.2d 257, 275–76 (S.D.N.Y.2007) (because "district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation," eight months is too long), and *Reyes v. City Univ. of N.Y.*, No. 06 Civ. 3639, 2007 WL 2186961, at *5 (S.D.N.Y. July 26, 2007) (eighteen months too long because it is well-settled that three to four months is too long).

Compl. ¶ 362. Finally, she argues that DSS's failure to terminate Mr. Lewis for filing a report

containing false statements is further evidence of retaliation. Pl. Mem. at 73.

Defendants argue that Ms. Anderson has failed to demonstrate that the termination of her

employment occurred due to her having engaged in a protected activity. Def. Mem. at 21.

Instead, they state that the record clearly shows that her termination was the result of her false

statements, which, they argue, is a legitimate, non-retaliatory reason for her termination. *Id.*

The Court agrees.

Neither party disputes that filing a workplace violence or sexual harassment complaint is

a protected activity. Further, the parties agree that Ms. Anderson's complaint was the but-for

cause of her termination. The parties disagree as to whether the inaccuracies in her report

amounted to false statements, as opposed to memory lapses, and whether these inaccuracies were

in fact the motivating factor in her termination.

Ms. Anderson's primary challenge here, as with her selective enforcement claim, is that

she has not provided any evidence to suggest that Defendants' proffered non-retaliatory reason

for terminating her (the false statements contained in her report) was pretextual, or that

retaliation was a substantial factor contributing to her termination. While Ms. Anderson's

termination was temporally proximate to the filing of her complaint, and such proximity has in

some cases sufficed to demonstrate potential retaliatory intent, *Smith*, 776 F.3d at 118 ("A

plaintiff may establish causation either directly through a showing of retaliatory animus, or

indirectly through a showing that the protected activity was followed closely by the adverse

action."), such an inference is not reasonable here because Defendants do not dispute that Ms.

Anderson's complaint was the but-for cause of her termination. Rather, the parties dispute

whether the fact of Ms. Anderson's report, or the false statements contained within it, was the

actual cause of her termination—something that the close temporal link between the complaint and the termination alone cannot resolve. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (while the temporal proximity between a plaintiff's complaint and their discharge may establish a *prima facie* case of retaliation, where a defendant provides an explanation of legitimate non-retaliatory reasons for discharge, the burden shifts back to the plaintiff "to come forward with evidence establishing that it is more likely than not the employer's decision was motivated, at least in part, by an intent to retaliate against him."); *Abrams v. Dep't of Public Safety*, 764 F.3d 244, 254 (2d Cir. 2014) ("Temporal proximity alone is not enough to establish pretext in this Circuit.").  As a result, there is no genuine issue of material fact as to Ms. Anderson's retaliation claim. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("Without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext . . . in order to raise a triable issue of fact.").

To the extent that Ms. Anderson seeks to rely on her earlier complaints regarding Mr. Lewis's alleged sexual harassment, complaints dating back to 2014, to support her retaliation claim—one apart from any hostile working environment claim—these complaints fall well outside of the two-to-three-month window for causation purposes, at this stage of the case. *See Raymond v. City of N.Y.*, 317 F. Supp. 3d 746, 774–75 (2d Cir. 2018) ("Courts in this circuit often finds a limit at two or three months and almost universally disapprove longer time periods." (internal quotation marks omitted)).

As to Mr. Lewis's complaint filed against Ms. Anderson, Mr. Lewis's actions do not provide a basis for a retaliation claim against any of the Defendants. As Mr. Lewis was not Ms. Anderson's supervisor, he had no authority to terminate her employment, nor was he a decision-maker in determining how to handle her complaint. *See, e.g.*, *Vega v. Hempstead Union Free*

*School Dist.*, 801 F.3d 72, 89 (holding that the plaintiff plausibly stated a claim for relief under Section 1983 because he alleged that the defendants each had "input into personnel decisions . . . including hiring, firing, evaluations and discipline of employees[.]"). Moreover, to the extent that Ms. Anderson tries to argue that Mr. Lewis's complaint caused her termination, *see Zeng v. N.Y.C. Housing Auth.*, 22-138-cv, 2023 WL 4553416, at *6 (2d Cir. July 17, 2023) ("The cat's paw theory of liability imputes a discriminatory motive to a decisionmaker where such action is proximately caused by the animus of a subordinate—that is, the supervisor, acting as agent of the employer, has permitted himself to be used as the conduit of the subordinates prejudice." (internal quotation marks omitted), quoting *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016)), the basis for her termination—one not otherwise refuted as to any of her employment-related claims, outside of the hostile work environment one—related to her own false statements, not the mere filing of a complaint by Mr. Lewis. *See, e.g.*, *JoAnna Laiscell v. Bd. of Ed., City of Hartford*, 20-cv-1463 (VLB), 2023 WL 6200325, at *9 (D. Conn. Sept. 22, 2023) (holding that a cat's paw theory of liability failed where the record showed that the employer had legitimate reasons for failing to promote the plaintiff). As a result, there is no genuine issue of fact regarding an alleged retaliation claim with respect to any of the Defendants.

Accordingly, Defendants' motion for summary judgment as to Ms. Anderson's retaliation claim, Count Six, will be granted.

### vi. Conspiracy (Count Seven)

To state a Section 1983 conspiracy claim, a plaintiff must allege "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). These elements

must be stated with sufficient specificity, typically including "details of time and place," "to enable [defendants] intelligently to prepare their defense. *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002); *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993); *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977). Mere "conclusory allegations" of conspiracy are insufficient as a matter of law. *Id.*; *Figueroa v. Town of North Haven*, 3:17-CV-650 (SRU), 2017 WL 6045421, at *5 (D. Conn. Dec. 6, 2017).

Making out a conspiracy claim in cases involving defendants who work together for the same entity is especially challenging. Under the intracorporate conspiracy doctrine, the Second Circuit has repeatedly held that "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978). In other words, "officers, agents, and employees of a single corporate entity are legally incapable of conspiring together." *Murphy v. City of Stamford*, 634 Fed. App'x 804, 805 (2d Cir. 2015), quoting *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (internal quotation marks omitted).

Ms. Anderson has brought a conspiracy claim against Defendants Rhoden and Lewis. She argues that: "The evidence shows the defendants Rhoden and Lewis held a planning meeting on or around March 28, 2018, mutually contrived the subject matter of their plan to effectuate Ms. Anderson's termination, by implementing a strategy to have Defendant Lewis file a sham complaint, at first, as a means to counter Ms. Anderson's complaint filed on March 26, 2018 . . ." Pl. Mem. at 92. She further argues that Ms. Rhoden and Mr. Lewis entered into this agreement

with the intent of covering up Mr. Lewis's ongoing sexual harassment and Ms. Rhoden's negligence. *Id.* at 88–89.

Defendants argue that they are entitled to judgment on Count Seven because Ms. Anderson has not demonstrated the existence of any shared enterprise among the Defendants, and more specifically, there is no evidence that Ms. Rhoden and Mr. Lewis met or communicated about Ms. Anderson's complaint at all. Def. Mem. at 21–22.

The Court agrees.

Significantly, there is no record evidence to support Ms. Anderson's claims regarding the March 28, 2022 meeting, either whether the meeting even took place, or to substantiate any of the alleged comments purportedly made by either Mr. Lewis or Ms. Rhoden. At her deposition, Ms. Anderson testified that she was not aware of whether Ms. Rhoden talked to Mr. Lewis about Mr. Lewis filing a complaint against her. Pl. Deposition Tr. at 129. In the absence of any such evidence creating a genuine issue of material fact, the denials of both Mr. Lewis and Ms. Rhoden are unrebutted.

Moreover, Ms. Anderson has not alleged any facts to establish a conspiracy under the intracorporate conspiracy doctrine. The alleged conspiratorial conduct in this case was "essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees[.]" *Herrmann*, 576 F.2d at 459. Even if Ms. Rhoden and Mr. Lewis did meet on March 28, 2022, Ms. Anderson has not produced any specific evidence to suggest that they acted outside of the scope of their employment. *Id.* (holding that there is no conspiracy where each employee has acted within the scope of their employment). Indeed, it is understandable that after learning of an incident between Ms. Anderson and Mr. Lewis, Ms. Rhoden might reasonably, in her supervisory capacity, have met and spoken with Mr. Lewis. In

short, there is not a genuine issue of material fact with respect to any alleged conspiratorial conduct, much less a claim that would survive under the intracorporate conspiracy doctrine.

Accordingly, Defendants' motion for summary judgment as to Ms. Anderson's conspiracy claim, Count Seven, will be granted.

### c.   Theories of Liability

For each of the claims discussed above, Ms. Anderson has named a number of Defendants besides Mr. Lewis, many of whom did not directly engage in the alleged unconstitutional activities. She proposes three different theories of liability—failure to train, failure to act, and supervisory liability—under which, she argues, these Defendants may properly be held responsible for her allegations. *See Poe v. Leonard*, 282 F.3d 123, 140–41 (2d Cir. 2002) (explaining that under Section 1983, a supervisor may be held liable for his deliberate indifference to the rights of others, either through his failure to act on information indicating the occurrence of unconstitutional acts, or for gross negligence in failing to supervise his subordinates who commit such wrongful acts, assuming that the plaintiff demonstrates a causal connection between the supervisor's actions and their injury); *Duch v. Jakubek*, 588 F.3d 757, 766 (2d Cir. 2009) (explaining that employers who offer a reasonable avenue of complaint to a plaintiff may still be held liable if they knew or should have known about the harassment, yet failed to take appropriate remedial action).

#### i.   *Failure to Train (Count One)*

In Count One, Ms. Anderson raises a failure to train claim against Defendants Lewis, Rhoden, Bonsignore, Johnston, Ferron-Poole, Bremby, and Plourde. Am. Compl. at 32. She asserts that the supervisory Defendants knew about Mr. Lewis's alleged history of sexual harassment and assault, and that they also knew "to a moral certainty" that Mr. Lewis would

engage in future interactions with female staffers at DSS and that training or supervision would help him to manage better. *Id.* ¶¶ 236–37. Adequate training or supervision, she argues, would have prevented the constitutional violations and subsequent injuries that she allegedly endured. *Id.* ¶ 244.

Defendants allege that Plaintiff's "failure to train" claim against each of the individual defendants, must fail because they amount to a *Monell* claim, which may not be brought against the State or a state actor as a matter of law. Def. Mem. at 12–14; *see Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978) ("Our holding today is, of course, limited to local government units which are not considered part of the State for Eleventh Amendment purposes"); *Amory v. Katz*, No. 3:15-CV-01535 (VAB), 2016 WL 7377091, at *4 (D. Conn. Dec. 19, 2016) ("A Monell claim is actionable only as to local governing entities and related municipal officials.").

Ms. Anderson has since withdrawn her failure to train claim. Pl. Mem. at 60.

Accordingly, Defendants' motion for summary judgment as to the failure to train claim, Count One, will be granted.

## ii.   Failure to Act (Counts One and Eight) [14]

In sexual harassment cases, an employer's "inaction may be actionable." *Burhans v. Lopez*, 24 F. Supp. 3d 375, 382 (S.D.N.Y. 2014); *see also Duch v. Jakubek*, 588 F.3d 757, 766 (2d Cir. 2009). In order to establish liability under a failure to act theory, the plaintiff must show that "(1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that

---

[14] Count One and Count Eight raise duplicative failure to act claims, except that Count One names all of the Defendants, while Count Eight excludes Mr. Lewis. Because they are substantively identical, these two claims are addressed jointly in this section.

knowledge, was unreasonable." *Duch*, 588 F.3d at 763. An employee's knowledge may only be imputed to an employer, where principles of agency law so dictate. This includes cases in which "a) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company, or b) the official is charged with a duty to act on the knowledge and stop the harassment, or c) the official is charged with a duty to inform the company of the harassment." *Torres v. Pisano*, 116 F.3d 625, 636–37 (2d Cir. 1997) (internal citation and footnote omitted).

For supervisors, who have such a duty to act on knowledge to stop harassment, such liability turns on notice that their subordinate was prone to commit some unconstitutional or unacceptable behavior. *Poe*, 282 F.3d at 141("[F]or a supervisor to be liable under section 1983 for his failure to inquire, he must first have been on notice that his subordinate was prone to commit some unconstitutional or unacceptable behavior."); *see also Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001) (holding that employers who have some notice that a particular employee is putting others at risk may have a responsibility to warn or protect future victims). "Such notice could be actual (for example, awareness of prior [constitutional] deprivations in a related context), or it could be constructive . . . ." *Poe*, 282 F.3d at 141. Generally, a plaintiff must also show an affirmative causal link between the supervisor's inaction and her injury. *Id.* Supervisors and employers may be liable under Section 1983 for failing properly to investigate and address allegations of sexual harassment when "through this failure, the conduct becomes an accepted custom or practice of the employer." *Gierlinger v. N.Y. State Police*, 15 F.3d 32, 34 (2d Cir. 1994).

For non-supervisory co-workers who "lack[ ] authority to counsel, investigate, suspend, or fire the accused harasser . . . the co-worker's inaction does not spark employer liability unless

that co-worker has an official or strong *de facto* duty to act as a conduit to management for complaints about work conditions." *Torres*, 116 F.3d at 636–37 (quoting *Lamb v. Household Credit Servs.*, 956 F. Supp. 1511, 1517 (N.D. Cal. 1997)).

In Counts One and Eight, Ms. Anderson articulates a failure to act claim against Defendants Lewis, Rhoden, Bonsignore, Johnston, Ferron-Poole, Bremby, and Plourde. Am. Compl. at 32, 50. In essence, she argues that the supervisory Defendants knew of Mr. Lewis's alleged constitutional violations and that they failed to act on the information in various ways, including: (1) failing to intervene in Mr. Lewis's ongoing harassment, (2) neglecting to use this knowledge when conducting the investigations into Ms. Anderson's allegations, and (3) terminating Ms. Anderson improperly, despite the injuries she had suffered. *Id.* at 50–52.

Defendants, in turn, argue that Ms. Anderson has failed to demonstrate that any of the Defendants failed to act at any time; rather, they claim, "the evidence demonstrates the exact opposite[.]" Def. Mem. at 20. More specifically, they alleged that "As soon as [Ms. Anderson] filed her March 26, 2018 complaint, DSS commenced an immediate investigation into [her] workplace violence complaint . . . and DSS commenced an immediate investigation into [her] sexual harassment complaint[.]" *Id.* at 16.

The Court agrees with respect to all Defendants, except for Ms. Rhoden.

As a preliminary matter, any failure to act claim against Mr. Lewis appears to be a mistake, as Ms. Anderson has alleged that Mr. Lewis actively engaged in harassing and assaultive conduct that caused her constitutional injury. She has not clearly alleged any failure to act on his part.

As to Ms. Bonsignore, Ms. Johnston, Ms. Ferron-Poole, Ms. Plourde, and Mr. Bremby, as a matter of law, there is nothing in this record to support a failure to act claim. Defendants

Bonsignore, Johnston, Ferron-Poole, and Plourde did not serve in a supervisory capacity with respect to Ms. Anderson and Mr. Lewis; therefore, none of them had a direct responsibility to intervene in Mr. Lewis's alleged behavior. Because of their investigatory duties, however, Ms. Bonsignore and Ms. Johnston did have an "official or strong de facto duty to act as a conduit to management for complaints about work conditions." *Torres*, 116 F.3d at 636–37. Likewise, Ms. Ferron-Poole and Ms. Plourde, as Ms. Bonsignore's and Ms. Johnston's supervisors, arguably had a responsibility to communicate to management any workplace issues that they were aware of. Mr. Bremby did serve in a supervisory management role with respect to Ms. Anderson and Mr. Lewis, and therefore did have a duty to act to stop unconstitutional behavior.

But regardless of their respective roles, Ms. Anderson's claim against each of them fails because there is no record evidence that any of these individuals had the requisite knowledge to trigger such a duty to intervene or to report Mr. Lewis to management. As to Ms. Bonsignore and Ms. Johnston, at best, Ms. Anderson has managed to demonstrate that there were investigatory avenues that these Defendants could (or should) have pursued, which may have led to some knowledge of Mr. Lewis's alleged actions.

For example, she argues that Ms. Bonsignore and Ms. Plourde failed to conduct a thorough, complete investigation by considering all evidence, as required by DSS policy. Pl. Mem. at 37. More specifically, she argues that Ms. Bonsignore and Ms. Plourde failed to interview key witnesses with "critical pieces of information" or to review Ms. Anderson's FMLA files, which outlined her memory issues, ultimately resulting in "sham investigations." Pl. Mem. at 37, 83. She further argues that Ms. Ferron-Poole, Ms. Plourde, and Mr. Bremby are

liable for these flawed investigations because they failed to ask relevant questions about the investigations before adopting them and ultimately terminating Ms. Anderson. *Id.* at 64.

But while Ms. Anderson has produced testimony of former co-workers who corroborate her account of ongoing harassment by Mr. Lewis through depositions conducted in the course of this proceeding, those individuals admitted that they had failed to relay this information to Ms. Bonsignore and Ms. Johnston during DSS's internal investigations. *See* Whichard Deposition Tr. at 24–25 (stating that she did not tell Ms. Bonsignore or Ms. Johnston that Mr. Lewis had sexually harassed Ms. Anderson prior to March 22, 2018); Cordier Deposition Tr. at 22–23 (explaining that when she was interviewed by Ms. Johnston, she answered truthfully the questions that were asked of her, but did not volunteer any additional information about Mr. Lewis's behavior because she "just felt like [she] didn't know enough to share").

As such, none of Ms. Anderson's allegations establish the type of knowledge required to support a failure to act claim under *Poe*. 282 F.3d at 142 ("Rather than examining what a supervisor could have learned had he reviewed his subordinate's personnel history [or investigated further], most courts have instead evaluated how the supervisor responded to the knowledge he possessed."). In the absence of any record evidence that Defendants Bonsignore, Johnston, Ferron-Poole, or Plourde had any actual or constructive knowledge of Mr. Lewis's alleged conduct or any constitutional violation allegedly suffered by Ms. Anderson, they cannot be held liable under a failure to act theory.

Ms. Anderson has alleged sufficient facts, however, to suggest that Ms. Rhoden may have been aware of Mr. Lewis's alleged conduct and thus had a responsibility to act. Ms. Anderson has asserted that she complained to Ms. Rhoden, her direct supervisor, about Mr. Lewis's conduct multiple times between 2014 and 2018. And while Ms. Rhoden denies that she

knew about Mr. Lewis's alleged conduct, the testimony of Ms. Whichard, Ms. Cordier, and Mr.

Roberts, discussed at length above, all suggest that Ms. Rhoden may have been aware of Ms.

Anderson's complaints. *See* Whichard Deposition Tr. at 7–10, 15–20; Cordier Deposition Tr. at

18–19, 23–24; Roberts Aff. Ms. Anderson has further alleged that, while Mr. Lewis was

physically separated from her following their mediation session, upon the move to the 55

Farmington Ave. office, Ms. Rhoden failed to maintain this separation and instead placed them

in neighboring cubicles. Am. Compl. ¶¶ 145–47.

      Based on this record, a reasonable jury could find that Ms. Rhoden had the requisite

notice of Mr. Lewis's alleged behavior and failed to act when she allowed them to be placed next

to each other in the new office. It is also possible that a jury could find that Ms. Rhoden's failure

to act on Ms. Anderson's complaints regarding Mr. Lewis constituted a failure to protect her

from future events like that of March 22, 2018. *See Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128,

136 (2d Cir. 2001) (holding that employers who have some notice that a particular employee is

putting others at risk may have a responsibility to warn or protect future victims); *see also*

*Meriwether v. Coughlin*, 879 F.2d 1037, 1047–48 (2d Cir. 1989) (finding supervisory liability

when evidence showed that supervisors knew or should have known that plaintiff inmates'

reputations as alleged planners of a violent insurrection would expose them to extreme hostility

from the guards, yet took no precautions for the inmates' safety). Finally, there is a genuine issue

of fact as to whether Ms. Rhoden violated her duty to report harassment to the agency, especially

during the course of the investigations following the elevator incident and Ms. Anderson's

subsequent termination.

      Accordingly, as Ms. Anderson has plausibly alleged that only Ms. Rhoden had the

requisite knowledge to support a failure to act claim, the Defendants' motion for summary

judgment as to Count Eight, will be granted as to Mr. Lewis, Ms. Bonsignore, Ms. Johnston, Ms. Ferron-Poole, Ms. Plourde, and Mr. Bremby, but will be denied as to Ms. Rhoden.

### iii.   Supervisory Liability (Count Three)

"A supervisor may not be held liable under Section 1983 merely because his subordinate committed a constitutional tort." *Poe*, 282 F.3d at 140; *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999) (explaining that because section 1983 imposes liability only upon those officials who actually cause a violation, the doctrine of *respondeat superior* is inapplicable). In other words, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)) (also noting that the Section 1983 violation "must be established against the supervisory official directly").

In order to prevail on a claim of supervisory liability, a plaintiff must satisfy one of three possible elements. First, a supervisory official may be liable if, after learning of the violation through a report or appeal, they have failed to remedy the wrong. *See, e.g.*, *U.S. ex rel. Larkins v. Oswald*, 510 F.2d 583, 589 (2d Cir. 1975). Second, "[a] supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue." *See Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986); *see also McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir. 1983). Finally, a supervisor may be liable for his failure to act—meaning, "his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring, or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and her injury." *See Poe*, 282 F.3d at 140; *Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d

246, 254 (2d Cir. 2001). Such liability typically turns on whether or not a supervisor had notice that their subordinate was prone to commit some unconstitutional or unacceptable behavior. *Poe*, 282 F.3d at 141 ("[F]or a supervisor to be liable under section 1983 for his failure to inquire, he must first have been on notice that his subordinate was prone to commit some unconstitutional or unacceptable behavior."); *see also Ferris,* 277 F.3d at 136 (holding that employers who have some notice that a particular employee is putting others at risk may have a responsibility to warn or protect future victims). In cases involving sexual harassment, supervisors may also be liable when, through their failure to properly to investigate and address allegations of sexual harassment, "the conduct becomes an accepted custom or practice of the employer." *Gierlinger*, 15 F.3d at 34.

In order to establish supervisory liability, Ms. Anderson asserts only a failure to act claim, which is essentially duplicative with Counts One and Eight. She argues that the supervisory defendants (all except Mr. Lewis) "knew to a moral certainty that Defendant Lewis would be confronted with various work situations involving female staffers, including [Ms. Anderson]" and that they "knew or should have known of [his] dangerous propensities," given Ms. Anderson's numerous complaints. Am. Compl. ¶¶ 281, 288. She further asserts that "each defendant was grossly negligent in supervising their subordinates because . . . they failed to act on information Ms. Anderson provided them indicating that unconstitutional acts were occurring, and had occurred." Pl. Mem. at 89; Am. Compl. at 51.

Defendants argue that Ms. Anderson has failed to demonstrate that any of the Defendants affirmatively engaged in any conduct with the intent of depriving her of her constitutional rights,

failed to remedy any violation of her constitutional rights that they were informed of, or created a policy or custom of constitutional violations. Def. Mem. at 20.

The Court agrees with respect to all of the supervisory defendants, except for Ms. Rhoden.

As described above, Ms. Anderson has provided sufficient evidence to create a genuine issue of fact as to whether Ms. Rhoden was aware of Mr. Lewis's alleged behavior prior to March 22, 2018; whether her subsequent actions, or lack thereof, constituted gross negligence; and whether there was an affirmative causal link between Ms. Rhoden's behavior and Ms. Anderson's injury. *See Blyden*, 186 F.3d at 265 (holding that prison officials may be held liable under Section 1983 for their deliberate indifference to protecting inmates from violence at the hands of fellow inmates or subordinates); *Williams*, 781 F.2d at 323 (generally describing the failure to act theory of supervisory liability).

As to the other Defendants, however, there is no record evidence that they knew or had reason to know of Mr. Lewis's alleged conduct. Therefore, Ms. Anderson has not established that these Defendants were put on notice that there was a high risk that Mr. Lewis would violate her constitutional rights. *Poe*, 282 F.3d at 142–43 (explaining that Second Circuit precedent "clearly establishes" that for a supervisor to be liable under Section 1983, they must have been on notice that their subordinate was prone to commit some unconstitutional or unacceptable behavior). As a result, Ms. Anderson has failed to establish that Ms. Bonsignore, Ms. Johnston,

Ms. Ferron-Poole, Ms. Plourde, and Mr. Bremby acted with the sort of gross negligence or deliberate indifference necessary to support a finding of supervisory liability.

Accordingly, Defendants' motion for summary judgment on the grounds of supervisory liability will be granted as to Ms. Bonsignore, Ms. Johnston, Ms. Ferron-Poole, Ms. Plourde, and Mr. Bremby, but denied as to Ms. Rhoden.

### D.  Qualified Immunity

Qualified immunity is intended to shield public officials from liability from civil damages when their actions were objectively reasonable in light of clearly established legal rules. *Poe*, 282 F.3d at 132. Courts engage in a two-pronged inquiry when deciding questions of qualified immunity at the summary judgment stage. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014). The first prong addresses the 'threshold inquiry' of whether the plaintiff has alleged a violation of federally protected rights" *Naumovski v. Norris*, 934 F.3d 200, 211 (2d Cir. 2019) (quoting *Kelsey v. Cty. of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (internal quotation marks omitted)). The second prong asks whether that right was clearly established at the time of the violation. *Tolan*, 572 U.S. at 655–56. More specifically, the Second Circuit has held that a state official sued in their individual capacity for damages arising out of their performance of discretionary functions is entitled to qualified immunity if they can demonstrate that: (1) their actions did not violate clearly established law, or (2) it was objectively reasonable for them to believe that their action did not violate such law. *See Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998);

*Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citing *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987); *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The first prong of the inquiry is addressed in the previous section. This section will therefore address only those claims that survived the analysis above.

Defendants argue that all of Ms. Anderson's claims are barred by qualified immunity because the actions of all Defendants were at all times "lawful, reasonable, and [did] not implicate any federal rights of the Plaintiff." Def. Mem. at 22. They do not assert more particularized arguments regarding the qualified immunity defenses of the various Defendants.

The Court will address the various Defendants separately in the following sections.

a. Mr. Lewis

Ms. Anderson claims that Mr. Lewis sexually harassed her consistently for years and that he physically assaulted her three times on March 22, 2018. Pl. Mem. at 103. These actions, she argues, are both objectively unreasonable and clearly violate both the State of Connecticut's policies on sexual harassment, as well as Ms. Anderson's constitutional right to be free of sexual harassment in the workplace. She states Mr. Lewis is therefore not entitled to a qualified immunity defense.

The Court agrees.

Mr. Lewis's alleged conduct—including making sexual comments, inappropriately touching Ms. Anderson, and assaulting her—were clearly established as unlawful sexual harassment at the time of the events in question. *See Davis v. Passman*, 442 U.S. 228, 234–35 (1979) (holding that individuals have a constitutional right under the equal protection clause to be free from sex discrimination in public employment); *see also Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134, 143–44 (2d Cir. 1933) (holding that "sexual harassment of

52

women constitutes disparate treatment because of gender, and is actionable under Section 1983"); *Carrero v. N.Y.C. Housing Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) (upholding a Section 1983 claim against a public official for improper sexual conduct toward an employee that created a hostile work environment). Mr. Lewis has thus failed to establish a qualified immunity defense because his alleged actions were not objectively reasonable and no rational jury could find that reasonable public officials would disagree about the legality of this type of conduct under the circumstances.

Accordingly, Mr. Lewis's motion for summary judgment based on qualified immunity defense will be denied.

### b. Ms. Rhoden

Ms. Anderson asserts that Ms. Rhoden discouraged staff from making complaints and consistently ignored reports of sexual harassment from the staff she supervised. She also notes that, given Ms. Rhoden's knowledge of Mr. Lewis's ongoing sexual harassment, it was objectively unreasonable for Ms. Rhoden to place Mr. Lewis at the cubicle next to hers, and that such an action violated the zero-tolerance sexual harassment policy at DSS.

The Court agrees.

In considering the question of qualified immunity for a supervisor, most courts evaluate how the supervisor responded to the knowledge he possessed, rather than what a supervisor could have learned had he reviewed his subordinate's personnel history. *Poe*, 282 F.3d at 142 (holding that qualified immunity should protect a supervisor who began working three years after a subordinate's indiscretions, when his role would not have cause him to be aware of such indiscretions and there was no agency policy requiring him to review the subordinate's personnel files); *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), cert. denied, 513 U.S. 813 (1994) and 513

U.S. 814 (1994) (holding that a newly appointed supervisor who had heard informal complaints about a subordinate officer but conducted a minimal investigation into those complaints acted objectively reasonably).

Yet, courts in this Circuit and beyond have declined to extend qualified immunity to supervisors who knew of complaints involving a subordinate and responded callously or failed to investigate. *See, e.g.*, *McCann v. Coughlin*, 698 F.2d at 125 (prison supervisory officials may be liable if they fail to act when they have actual notice that unconstitutional practices are occurring); *Camilo–Robles v. Hoyos*, 151 F.3d 1, 11–15 (1st Cir. 1998) (holding that various supervisors and psychiatrists were not entitled to summary judgment based on qualified immunity because the evidence showed that they were reckless and wanton in re-arming a police officer who they knew had an extensive history of violent behavior and who had then beaten and wrongfully arrested the plaintiff), cert. denied, 525 U.S. 1105 (1999). Other courts have further held that individuals who lack actual notice of ongoing constitutional violations may still be denied qualified immunity if their position is such that they should have known, and their lack of knowledge is attributable to their failure to fulfill a duty to investigate. *See Wright v. McMann*, 460 F.2d 126, 135 (2d Cir. 1972); *King v. Higgins*, 702 F.2d 18, 21 (1st Cir.), cert. denied sub nom. *Vinzant v. King*, 464 U.S. 965 (1983).

In addition to Ms. Rhoden's alleged consistent dismissal of complaints by her subordinates, Ms. Anderson also claims that Ms. Rhoden had actual knowledge of Mr. Lewis's behavior and failed to intervene. As a result, there is a sufficient basis in this record to find Ms.

Rhoden's conduct was objectively unreasonable and unlawful, and that it violated Ms. Anderson's clearly established right to be free of sexual harassment in the workplace.

Accordingly, Ms. Rhoden motion for summary judgment on the basis of a qualified immunity defense will be denied.

### c.   Ms. Bonsignore and Ms. Johnston

Ms. Anderson alleges that Ms. Bonsignore and Ms. Johnston failed to interview key witnesses with "critical pieces of information" or to review Ms. Anderson's FMLA files, which outlined her memory issues, ultimately resulting in "sham investigations" Pl. Mem. at 37, 83. Ms. Anderson argues that these actions were objectively unreasonable and resulted in her termination on the basis of her sex.

The Court disagrees.

Ms. Anderson suggests a number of investigatory avenues that she believes Ms. Bonsignore and Ms. Johnston should have pursued. The record reflects that both defendants conducted reasonable investigations, however, into the events of March 22, 2018, including conducting numerous interviews with other staff in Ms. Anderson's and Mr. Lewis's units. Although some of those witnesses have since offered testimony about Mr. Lewis's alleged harassment through depositions in this litigation, these witnesses admit that they did not disclose such information to Ms. Bonsignore and Ms. Johnston during their investigations. *See* Whichard Deposition Tr. at 24–25 (stating that she did not tell Ms. Bonsignore or Ms. Johnston that Mr. Lewis had sexually harassed Ms. Anderson prior to March 22, 2018); Cordier Deposition Tr. at 22–23 (explaining that when she was interviewed by Ms. Johnston, she answered truthfully the questions that were asked of her, but did not volunteer any additional information about Mr. Lewis's behavior because she "just felt like [she] didn't know enough to share").  Ms. Anderson

has thus not produced any evidence to suggest that Ms. Bonsignore and Ms. Johnston knew or should have known about Ms. Anderson's allegations regarding Mr. Lewis's harassment. Nor has she identified any clear way in which these defendants' investigations were objectively deficient, unreasonable, or unlawful.

Accordingly, even if the Court had not otherwise dismissed any and all claims against them, Ms. Bonsignore's and Ms. Johnston's motions for summary judgment on the basis of a qualified immunity defense would have been granted.

### d.   Ms. Ferron-Poole, Ms. Plourde, and Mr. Bremby

Ms. Anderson argues that Ms. Ferron-Poole, Ms. Plourde, and Mr. Bremby acted objectively unreasonably when they adopted the investigations and recommendations of Ms. Bonsignore and Ms. Johnston without verifying or questioning their claims. Pl. Mem. at 105. She further claims that Ms. Ferron-Poole and Ms. Plourde were dishonest about their role in the recommending that Ms. Anderson be fired on the basis of the "flawed investigative reports." *Id.* at 104–05. Finally, she argues that Mr. Bremby failed to ask questions that would have prevented his subordinates from lying to him. *Id.*

The Court disagrees.

First, based on this record, there is no genuine issue of material fact as to whether Ms. Bonsignore and Ms. Johnston conducted investigations in an objectively reasonable and lawful manner, and thus, there is no basis for this Court finding that their supervisors acted unreasonably in adopting their findings. "[S]upervisors cannot be expected to reinvent the wheel with every decision, for that is administratively unfeasible; rather, they are entitled to rely upon the decisions of their predecessors or subordinates so long as those decisions do not appear to be obviously invalid, illegal or otherwise inadequate." *See Martinez v. Simonetti*, 202 F.3d 625, 635

(2d Cir. 2000) (finding that it was erroneous for the trial court to conclude that police supervisors had a duty to conduct an independent investigation before charging a suspect); *Cecere v. City of N.Y.*, 967 F.2d 826, 829 (2d Cir.1992) ("Absent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake *de novo* investigations or to cross examine subordinates reasonably believed to be competent as to whether their investigations were negligent."); *Varrone v. Bilotti*, 123 F.3d 75, 81 (2d Cir. 1997) (finding that it was erroneous for the district court to conclude that police officers had a duty to independently investigate the basis for a facially valid strip search order).

There is not a sufficient basis in this record for a reasonable jury to conclude that any aspect of Ms. Bonsignore's and Ms. Johnston's decisions or reports were "obviously invalid, illegal or otherwise inadequate." *Martinez*, 202 F.3d at 635. Therefore, a reasonable jury could not find that Ms. Plourde's, Ms. Ferron-Poole's, and Mr. Bremby's reliance on these documents and investigations was objectively unreasonable.

Accordingly, even if any and all claims against them had not been dismissed for other reasons, the motion for summary judgment on behalf of Ms. Ferron-Poole, Ms. Plourde, and Mr. Bremby, based on a qualified immunity defense would have been granted.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED** as to Counts One, Two, Six, and Seven.

Summary judgment is also **GRANTED** as to any other claims brought against Defendants Bonsignore, Johnston, Plourde, Ferron-Poole, and Bremby.

Summary judgment is **DENIED** as to the hostile work environment theory of sex discrimination under Section 1983 against Defendants Lewis and Rhoden, a claim allegedly arising from Defendant Lewis's actions in March of 2018.

SO ORDERED at Bridgeport, Connecticut, this 29th day of September, 2023.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE